# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CHRISTOPHER VALENCIA**,

      Plaintiff,

v.                                            **No: 1:17-cv-509-RB-SCY**

**THE BOARD OF REGENTS**, **University
of New Mexico**, **ROBERT FRANK**, in his individual
capacity, **CHAOUKI ABDALLAH**, in his individual
capacity, **CAROL PARKER**, in her individual capacity,
**MARK PECENY**, in his individual capacity, **LES
FIELD**, in his individual capacity, **RONDA BRULOTTE**,
**ERIN DEBENPORT**, **LINDSAY SMITH**, **FRANCIE
CORDOVA**, in her individual capacity, **LAURA LYNN
BUCHS**, in her individual capacity, **HEATHER COWAN**,
in her individual capacity, **AARON JIM**, in his individual
capacity, **ALEXDANDRA TACEA**, **KAYLA AHMED**,
**DANIELLE KABELLA**, **JOE SCEARCE**, **LAURA
MORRIS**, **JULIA FULGHUM**, in her individual
capacity, **ALBERT SENA**, **DENNIS OLGUIN**, and
**SARAH LEISTER**,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

After Plaintiff Christopher Valencia's multiple opportunities to consolidate and organize the Complaint, the Court now begins the task of parsing through the myriad claims. At the heart of this matter is the brief but tumultuous time Plaintiff taught in the University of New Mexico's (UNM) anthropology department. Though he began without incident, Valencia eventually faced multiple disciplinary actions for accusations of sexual orientation discrimination, sexual harassment, and assault. In the end, UNM terminated his employment contract. Amid the numerous allegations, however, some colleagues took matters into their own hands. Instead of allowing institutional processes to play out, they published incendiary social media posts, pressured students, and shared information with the press. Meanwhile, flaws in UNM's internal

processes prolonged this matter well beyond what was reasonable, and without giving Plaintiff a chance to offer a defense. In this Memorandum Opinion and Order, the Court takes up three motions to dismiss addressing: the constitutional violations under §§ 1983 and the 1985(3) conspiracy claims (Doc. 112); the civil conspiracy claims (Doc. 118); and the defamation and slander per se claims (Doc. 116). As a result of Plaintiff's conclusory and deficient pleading, the Court will dismiss most counts but will allow some of the procedural due process, defamation, and slander per se claims to proceed.

## I.    Background[1]

Defendant UNM Board of Regents hired Valencia into the anthropology department in 2012. (Doc. 83 (Am. Compl.) ¶¶ 30–31.) Valencia performed his duties without incident for three years. (*Id.* ¶ 35.) On June 15, 2015, Defendant Les Field, department chair, told Valencia that some students filed a complaint against him with the Office of Equal Opportunity (OEO). (*Id.* ¶ 37.) Despite Valencia's attempts to collect more information, Field would not elaborate on the substance of the complaints. (*Id.* ¶¶ 37–38.) Valencia heard no more about the OEO complaint until Field emailed him two months later. (*See id.* ¶¶ 40, 42.) In his email, Field told Valencia that Defendants Mark Peceny and Julia Fulghum had requested Valencia's recusal from grading comprehensive exams for the 2015–16 year because of the OEO investigation. (*Id.* ¶ 42.) Field told Valencia that his recusal from grading was an "action . . . that is disciplinary in nature without any formalized, written, or official reason for doing so." (*Id.* ¶ 44.) Valencia complained to the

---

[1] The facts in this section are taken from Plaintiff's Fourth Amended Complaint (Doc. 83 (Am. Compl.)), and all well-pleaded factual allegations are presented in this section as true and construed in a light most favorable to Plaintiff. *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015). Typically, if a court considers material outside the complaint, the matter becomes one for summary judgment. *Inge v. McClelland*, 725 F. App'x 634, 637–38 (10th Cir. 2018). The Court acknowledges that Plaintiff attached 93 pages of supporting documentation. The parties confined their briefing to the Amended Complaint, so at this stage of litigation, the Court will also limit its analysis to the allegations made within the Amended Complaint.

University's Compliance Office, protesting that removing him from grading "constituted an adverse action taken without proper notification and in the absence of any opportunity to contest the decision." (*Id.* ¶ 47.)

In response to Valencia's complaint, the Senior Vice Provost, Defendant Carol Parker, began an investigation. (*Id.* ¶ 48.) She found that Field, Peceny, and Fulghum recused Valencia from grading to strike a balance between Valencia's and students' concerns over the OEO complaints. (*Id.*) Parker determined that this "temporary suspension" was allowable under UNM policy. (*Id.*) During this time, Valencia remained suspended despite his inability to defend himself against unknown complaints and his contrary belief that no UNM policy justified this action. (*Id.* ¶¶ 48, 50–52.)

Valencia learned about the substance of the complaints in September 2015. (*See id.* ¶ 56.) First, the OEO—through Defendant Laura Lynn Buchs—told Valencia that his student, Defendant Danielle Kabella, accused him of sexual orientation discrimination. (*Id.*) Then the OEO notified Valencia that Defendant Kayla Ahmed, a former UNM graduate student, accused him of sexual harassment and gender discrimination. (*Id.* ¶ 61–62.) Ultimately, the OEO determined that both complaints lacked probable cause. (*Id.* ¶¶ 60, 65.)

By this time, Valencia suspected that three female professors, Defendants Ronda Brulotte, Erin Debenport, and Lindsay Smith had been engaging in a "smear" campaign. (*See id.* ¶ 69.) He noticed that the students lodging complaints against him were students mentored by Brulotte, Debenport, or Smith. (*Id.* ¶ 68.) He repeatedly told Field that other faculty had informed him about the three professors' attacks and false allegations, and that they had coached student complaints. (*See id.* ¶¶ 70, 73, 79.)

Field said that he forwarded Valencia's concerns to the OEO, but there is no evidence that the OEO did anything in response. (*See id.* ¶¶ 77, 82–83.) Brulotte, Debenport, and Smith's attacks continued unabated. (*See id.* ¶ 86.) For example, Brulotte told students that Valencia was under investigation for "sexual predation." (*Id.* ¶ 84.) And in the presence of students at a local restaurant, Brulotte and Debenport high-fived each other and proclaimed that they were "going to take Valencia down." (*Id.* ¶ 128.) Consequently, students dropped Valencia as their advisor, and he was removed from academic committees. (*See id.* ¶ 86.) When later asked why nothing was being done, Field told Valencia that he had been instructed "to not address Valencia's request for relief from the hostile work environment." (*See id.* ¶ 88.)

**Investigation into anthropology department and original disciplinary action**

After repeated complaints from Valencia, the OEO launched a "Departmental Investigation" into discrimination and sexual harassment in the anthropology department. (*See id.* ¶¶ 89–91.) During the investigation, the OEO did not give Valencia an opportunity to respond to adverse claims, or even provide notice of what those claims were, despite UNM policy requiring notice and an opportunity to respond. (*See id.* ¶¶ 94–95, 98.) The OEO did not allow Valencia to identify favorable witnesses, despite policies requiring the OEO to do so. (*Id.* ¶ 100.) When students did submit statements on Valencia's behalf, the OEO chose not to interview them. (*Id.* ¶¶ 107, 114.) And despite policy limiting OEO investigations to claims brought within 90 or 180 days of the alleged conduct absent a finding of good cause, the OEO took up allegations against Valencia that were over 12 months old without identifying good cause to investigate the stale claims. (*Id.* ¶¶ 96–97, 108.)

Apart from the OEO's conduct, the atmosphere surrounding the investigation was troubling. Students complained that they were under pressure to support the accusers against

Valencia, and that those who refused were called "anti-feminist," dismissed as not understanding the seriousness of the claims against Valencia, or accused of victim blaming. (*Id.* ¶¶ 115–16, 118, 123.) Brulotte, Smith, and Debenport invited students for meetings to discuss "the situation in the department." (*Id.* ¶ 121.) In those meetings, the three professors shared confidential information about their interactions with the OEO, the anthropology department administration, and the pending investigations. (*Id.*) Brulotte also posted on Facebook in a manner viewable by some students, making clear her opposition to Valencia and claiming that anyone who did not support her views "was not a feminist." (*See id.* ¶ 129.) As a result, students who did not believe the allegations against Valencia hesitated to come forward for fear of social backlash or retaliation from Brulotte, Smith, or Debenport. (*See id.* ¶¶ 117, 122.)

After nine months, the OEO released its findings in March 2016. (*Id.* ¶¶ 103, 133.) The OEO found that most of the allegations against Valencia lacked corroboration but found probable cause to believe that Valencia had engaged in discriminatory conduct based on sexual orientation and gender identity, and that Valencia subjected students to a sexually-harassing and hostile academic environment. (*Id.* ¶¶ 104–05.) After the OEO's findings were released, Peceny sent Valencia a notice of emergency suspension, from which Valencia learned that he was suspended immediately and indefinitely "[d]ue to the risk of imminent harm to students stemming from [his] behavior . . . ." (*Id.* ¶ 131–32.)

In April 2016, Valencia appealed the OEO's findings to the Office of the President and the Academic Freedom & Tenure Committee (AFTC). (*Id.* ¶¶ 134–35.) UNM President Defendant Robert Frank denied Valencia's request for a discretionary appeal without any substantive review, in contravention of UNM policy. (*See id.* ¶¶ 136–37.) But the AFTC found that the anthropology department may have committed procedural error by relying on the emergency suspension

provision, which was only meant for a "short term condition" as a stopgap measure to forestall imminent harm. (*Id.* ¶¶ 138, 140.) Although Valencia protested the length of the emergency suspension to Peceny and Field, neither individual responded to Valencia's concern, and the emergency suspension kept Valencia from the workplace for two-and-a-half months. (*Id.* ¶¶ 142–43.)

Eventually, Field issued a letter of censure, and Valencia returned to his normal duties. (*Id.* ¶¶ 149–50.) Valencia appealed the letter of censure after receiving assurances from the University that appealing did not carry the risk of additional punishment. (*See id.* ¶ 152.)

**Media fury, reopening of investigation, and termination of employment**

Amid the controversy surrounding Valencia, the United States Department of Justice (DOJ) released a critical report related to UNM's handling of Title IX cases. (*Id.* ¶¶ 144–48.) At the same time, "a media firestorm broke out over UNM's decision to return Valencia to his teaching duties." (*Id.* ¶ 153.) Brulotte, Smith, and Debenport "met with local television stations and print media" to share their views about Valencia's situation. (*See id.* ¶ 154.)

Valencia filed a complaint under UNM's Respectful Campus policy, noting that Brulotte, Smith, and Debenport allowed their attorneys to disclose confidential information to the media, that the OEO did nothing to protect him, and that he was now the target of derogatory and threatening emails. (*Id.* ¶ 163.) Neither the University, the OEO, nor the anthropology department addressed Valencia's concerns. (*Id.* ¶ 165.)

Instead, the University reopened its investigation into Valencia and made a broad solicitation for "any students who had any information related to Valencia participating in the sexual harassment of students." (*Id.* ¶¶ 156, 158.) Shortly afterwards, Valencia was again placed on emergency suspension based on new information the University received. (*Id.* ¶ 160.)

Defendant Albert Sena, a UNM maintenance employee, accused Valencia of being involved in a drunken assault and battery in Spring 2015. (*Id.* ¶ 166.) And Defendant Laura Morris, a former student of Valencia's, accused Valencia of engaging in inappropriate conduct and of discriminating against her because of her race. (*Id.* ¶¶ 169–71.)

Valencia filed yet another complaint with the OEO, reiterating that Brulotte, Smith, and Debenport engaged in an unchecked media campaign against him and noting that his previous complaints to the anthropology department were fruitless. (*Id.* ¶¶ 174, 176.) Brulotte even posted a photograph of Valencia on Facebook with the caption: "I am a sexual predator." (*Id.* ¶ 175.)

In August 2016, Peceny, who was handling Valencia's letter of censure appeal, decided to terminate Valencia's employment for cause. (*Id.* ¶¶ 177, 179.) Valencia appealed Peceny's decision to the Provost, Defendant Chaouki Abdallah, but he upheld Peceny's decision. (*Id.* ¶ 183.) Then in a decision signed by OEO administrators, Defendants Aaron Jim and Francie Cordova, found no probable cause to support Valencia's claims against Brulotte, Smith, and Debenport. (*Id.* ¶ 185.) Valencia attempted to appeal his discharge to the AFTC, but the AFTC would not hear his appeal. (*Id.* ¶ 187.)

**Valencia's lawsuit and the present motions to dismiss**

Consequently, Valencia filed this lawsuit implicating various constitutional provisions through § 1983, § 1985(3) conspiracy, and Title VII. Plaintiff also alleges supplemental state claims including breach of contract, state civil conspiracy, defamation, slander per se, and New Mexico Human Rights Act abuses. The Court's jurisdiction arises under 28 U.S.C. §§ 1331 and 1367. In three separate motions, Defendants ask the Court to dismiss various claims in Valencia's Amended Complaint.

## II. Legal Standard: Failure to State a Claim

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), but it need not include "*detailed* factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added) (citation omitted). Inadequate pleading permits district courts to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the Court, taking all well-pled allegations as true, assesses whether the complaint contains "a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted). The Supreme Court has been clear that no probability requirement exists, but a *plausibility standard* still governs, which "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (citation omitted). Thus, courts should dismiss claims when it is "obvious" that there is no way to prevail with the available facts. *See Brown v. Sherrod*, 284 F. App'x 542, 543 (10th Cir. 2008) (citation omitted).

## III. Civil Rights Claims Under §§ 1983 and 1985 (Counts I–VII)

Section 1983 provides that: "Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . ." 42 U.S.C. § 1983. Historically, acting under "color of law" meant that officer actions needed the backing of state authority. *West v. Atkins*, 487 U.S. 42, 49 (1988). The Tenth Circuit has held that state employment does not automatically impute state authority on an action; rather, the employee must act through the state or give the impression that state authority was behind it. *Jojola v. Chavez*, 55 F.3d 488, 493 (10th Cir. 1995). Without standalone power,

§ 1983 acts as the conduit for constitutional violations, allowing individuals to recover monetary damages from state officers in their personal capacities. *Hafer v. Melo*, 502 U.S. 21, 30 (1991).

The state and its agencies, however, are shrouded with Eleventh Amendment immunity in federal court. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989). Yet most individual officers only receive qualified immunity. *Hafer*, 502 U.S. at 28. This doctrine recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978)). To defeat qualified immunity, plaintiffs must show that an official's actions "violate[d] *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818 (citations omitted) (emphasis added). This is no easy task. *Clearly established* means that "there must be a Supreme Court or Tenth Circuit decision on point, or the *clearly established* weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (quoting *Medina v. City & Cty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)). That is, the law must be "indisputable" or "unquestioned." *Lobozzo v. Colo. Dep't of Corr.*, 429 F. App'x 707, 710 (10th Cir. 2011) (quoting *Zweibon v. Mitchell*, 720 F.2d 162, 172–73 (D.C. Cir. 1983)).

Here, Plaintiff alleges violations of the First Amendment, the Equal Protection Clause under the Fourteenth Amendment, and both procedural and substantive theories of the Due Process Clause under the Fourteenth Amendment.

### a. The State has not waived sovereign immunity as it pertains to the UNM Board of Regents.

As a preliminary matter, Plaintiff has acknowledged that the UNM Board of Regents, named throughout the Amended Complaint, is a state actor. (Doc. 121 at 23.) The Supreme Court

has held that the state cannot be sued unless the state abrogates sovereign immunity. *Will*, 491 U.S. at 72–73. Plaintiff admits that the state has not done so and concedes to the UNM Board of Regents' dismissal. (Doc. 121 at 23.) Therefore, the Court will dismiss Counts I–III, V, and VI as to the UNM Board of Regents.

### b. Plaintiff does not adequately plead facts to support his First Amendment—Retaliation claims (Count I).

Defendants first move to dismiss Plaintiff's First Amendment claims because the Fourth Amended Complaint lacks specificity and misapplies the legal standard. (Doc. 113 at 6–10.) Courts have repeatedly addressed First Amendment retaliation in § 1983 actions, holding that it is "settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation omitted). To ensure that this constitutional protection is not obstructed, courts ask:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Butler v. Bd. of Cty. Comm'rs for San Miguel Cty.*, 920 F.3d 651, 655 (10th Cir. 2019), *petition for cert. docketed*, (Sept. 3, 2019) (No. 19-285) (quotation marks and subsequent citation omitted).

Particularly relevant is the definition of "public concern." The Supreme Court instructs courts to evaluate "the content, form, and context" of the speech. *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). For instance, when the plaintiff "speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum . . . ." *Id.* at 147 (citation omitted).

The Tenth Circuit provides additional guidance: Speech related to political activities in an election context concerns the public. *See Bass v. Richards,* 308 F.3d 1081, 1089 (10th Cir. 2002). But when the speech relates to internal affairs, *see Hom v. Squire*, 81 F.3d 969, 974 (10th Cir. 1996), or personal employment matters, *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1233–34 (10th Cir. 1998), the speech is inherently private. Sister circuits are also instructive. The Third Circuit faced similar facts to those before this Court and held that the plaintiff's speech was not a matter of public concern because it "sought not to expose discriminatory or harassing practices or policies . . . but complained solely about his own 'abuse' and mistreatment by superiors and co-workers." *Bell v. City of Phila.*, 275 F. App'x 157, 159 (3d Cir. 2008) (citation omitted); *but see Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (acknowledging that harassment is usually a matter of public concern but holding that plaintiff failed to state a claim).

Defendants explain first that "in the 195 paragraphs leading up to the First Amendment Claim in Count I, Plaintiff makes no reference to any protected speech, when this protected speech was allegedly made and to whom or how it actually influenced any of the adverse actions against him." (Doc. 113 at 7.) Moreover, they contend that "speech related only to a personal grievance does not involve a matter of public concern and is thus not protected by the first amendment." (*Id.* at 9.) Yet Plaintiff maintains that he "complained to Field, Peceny, and Fulghum that his removal from grading . . . was arbitrary" and that it "violated policies and due process." (Doc. 121 at 13.) He filed grievances with the OEO "that he was being subjected to a hostile work environment, discrimination, and retaliation." (*Id.*) And as a result of his repeated complaints, he was "subjected to a number of adverse actions." (*Id.* at 14.)

The Court finds Defendants' arguments more compelling. While claims of racial discrimination and harassment in the workplace often rise to the level of public concern, Plaintiff

only alleges discrimination in a personal context. Valencia was not invoking UNM policies generally or speaking to a broader audience about discrimination. Retaliation claims protect the sorts of sweeping public statements that contain political and social messaging aimed at a wider audience.

Moreover, even if Plaintiff's individual grievances rose to a level of public concern, he has not sufficiently pleaded facts connecting these statements to his adverse employment actions. In *Boxill*, the court found that a plaintiff provided "no facts to support a reasonable inference that any of these Defendants individually [retaliated,] . . . much less that he or she did so in response to [plaintiff's] protected speech. Summary reference to a single, [multi]-headed 'Defendants' does not support a reasonable inference that *each* Defendant is liable for retaliation." 935 F.3d at 518. The Court cannot help but see parallels. In this case, Valencia levies this claim against 11 members of the UNM administration—from the OEO, to the College of Arts & Sciences, up the chain of command to the President. (Am. Compl. ¶ 212.) He alleges that he complained to the OEO about discrimination in the anthropology department (*id.* ¶ 65), then to the administration about OEO's failure to address his complaints (*id.* ¶ 90). But he draws only a conclusory connection between his statements and his termination, alleging that his "free speech rights constituted substantial factors related to a number of adverse employment actions." (*Id.* ¶ 204.) The Amended Complaint lacks specific allegations that administrators used Plaintiff's statements—directly or indirectly—to justify his termination.

To properly make out a First Amendment retaliation claim, Plaintiff would need specific facts tying the adverse employment action to his statements about discrimination. While the Court recognizes the difficult working environment that Plaintiff claims to have been subjected to, some

of the remaining claims provide more appropriate vehicles to address his concerns. As a result, the Court dismisses Count I against all Defendants.

### c. Plaintiff fails to make out an Equal Protection claim (Count II).

Defendants next ask the Court to dismiss Plaintiff's Equal Protection claims. (Doc. 113 at 15–17.) The Fourteenth Amendment guarantees equal protection of the laws. U.S. Const. amend. XIV. Courts apply the *McDonnell Douglas* framework to "§ 1983 claims based on allegations of racial discrimination in violation of the Equal Protection Clause." *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1007 (10th Cir. 2001) (citations omitted). First, the plaintiff must demonstrate that he is part of a protected class and "suffered an adverse employment action under circumstances giving rise to an inference of discrimination." *Lucas v. Office of Colo. State Pub. Def.*, 705 F. App'x 700, 703 (10th Cir. 2017) (citation omitted). Next, the employer may supply a non-discriminatory reason for the action. *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802 (1973). The Tenth Circuit "has repeatedly and recently held that a defendant need only proffer a reason that is legitimate and non-discriminatory on its face" to survive a challenge. *Lucas*, 705 F. App'x at 705 (citation omitted). Plaintiff then receives a final opportunity to show that defendant's explanation is mere pretext for discrimination. *McDonnell Douglass*, 411 U.S. at 804.

Defendants argue that Valencia's claims "of hostile work environment are once again too factually vague to survive a motion to dismiss." (Doc. 113 at 16.) For instance, of the listed Defendants, he does not specify who contributed to the environment or who sent "derogatory and vicious" emails. (*Id.* at 16.) The claims amount to mere conclusions. For example, Plaintiff says: "As an Assistant Professor of color, Valencia was negatively affected by the gender, ethnic and race prejudice of Department of Anthropology administration and faculty."[2] (*Id.* at 16 (quoting

---

[2] Despite the fact that Plaintiff discusses UNM faculty in this claim, he does not name the three departmental professors—Brulotte, Smith, or Debenport. (Am. Compl. ¶ 225.)

Am. Compl. ¶ 200).) Plaintiff, however, points the Court to his removal from grading (Am. Compl. ¶¶ 42–53); his complaints to the OEO regarding gender and racial discrimination in the department (*id.* ¶ 60); and the harassment from members of the faculty (*id.* ¶¶ 129–37, 172–95). He argues that these instances sufficiently meet pleading standards. (Doc. 121 at 22.)

Again, the Court leans in the direction of Defendants. Plaintiff misunderstands the standard, attempting to fit square facts in a round legal framework. In workplace cases, equal protection aims to prevent adverse employment actions rooted in discrimination. Though Plaintiff states that he made complaints to the OEO throughout his time at UNM, he fails to connect any alleged discrimination to his termination.

The first adverse employment action cited Plaintiff's teaching practices and alleged sexual orientation discrimination against a student. (*Id.* ¶¶ 48, 56–64.) Subsequently, Plaintiff faced a difficult work environment amid the cloud of investigation. (*Id.* ¶¶ 69–79.) While pressure mounted to handle harassment incidents more effectively—in the wake of an unfavorable DOJ Report—the University solicited students for additional claims against Valencia, and in August 2016, UNM placed him on emergency suspension. (*Id.* ¶¶ 156–61.) These new allegations included assault (*id.* ¶ 166) and "inappropriate sexual conduct" with a student (*id.* ¶ 171). While the administration found no probable cause to act on the assault charge, UNM terminated Valencia in response to the latter allegation. (*Id.* ¶ 177–79.) In looking at these adverse actions, the Court sees facially-legitimate reasons for termination that have nothing to do with Plaintiff's complaints of discrimination. Though the Court finds the OEO's poor communication and failure to adequately address Plaintiff's own complaints troubling, the Equal Protection Clause is again the wrong means to reach the root of Valencia's problems: inadequate processes and direct harassment from fellow faculty members. UNM provided facially non-discriminatory reasons for Plaintiff's

termination that are not pretext for discrimination, and Plaintiff has subsequently failed to connect his discrimination claims to his firing. Therefore, the Court will dismiss Count II as to all Defendants.

### d. Plaintiff pleads sufficient facts to make out a Procedural Due Process Clause violation (Count III).

Defendants next assert that Plaintiff failed to plead facts to make out a procedural due process claim. (Doc. 113 at 10–11.) The Court disagrees. The Fourteenth Amendment reads: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. At its most basic level, a court will evaluate (i) whether a protected property or liberty interest was at issue and (ii) whether appropriate processes were in place to protect the individual. *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1219 (10th Cir. 2006). Property interests require "a legitimate claim of entitlement." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The court must "ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure . . . and any remedies for erroneous deprivations provided by statute or tort law." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). The central tenets of procedural due process are notice, hearing, and the right to be heard. *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). With that, the court evaluates (i) the private interest affected; (ii) the risk of deprivation through existing procedures and the value of additional measures; and (iii) the burden placed on the government to adopt such safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Defendants' argument again rests on the lack of specificity in pleading. They state that while "Plaintiff identifies what he sees as procedural deficiencies by the OEO, nowhere does the Amended Complaint attribute to an [i]ndividual Defendant a specific unconstitutional action or how the actions of even one of the [i]ndividual Defendants specifically violated his rights to due

process." (Doc. 113 at 11.) Plaintiff, however, counters that he "plead[ed] a number of facts in the Factual Allegations section of the . . . Complaint relevant to due process that Defendants entirely overlook." (Doc. 121 at 19.)

The Court agrees with Plaintiff. Unlike other claims that lack detail, he cites specific events and actors within the appropriate legal framework. At the outset, Plaintiff had a property interest in his employment. As a state employee, he could only be terminated for cause. To have a property interest in public employment, a plaintiff must have more than a "unilateral expectation," and instead, he must have "a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. In New Mexico, employment without a definite term is presumed to be at-will. *Trujillo v. N. Rio Arriba Elec. Coop., Inc.*, 41 P.3d 333, 341 (N.M. 2001). And as a matter of law, a public employee cannot have a property interest in at-will employment. *See Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 536–37 (10th Cir. 1995). But Plaintiff had a term contract for the period August 1, 2016, to May 31, 2017. (Am. Compl. ¶ 292.) Therefore, he was entitled to this constitutional protection, and the Court will look to the three-part framework to see whether the University had adequate procedures.

First, notice. When Plaintiff received the initial temporary suspension, the Amended Complaint alleges that "Field sent Valencia an email noting, among other things, that Peceny and Fulghum had requested to remove Valencia from grading comps for 2015–2016 because of an ongoing [OEO] investigation." (*Id.* ¶ 42.) Valencia then complained that there was no "proper notification." (*Id.* ¶ 47.) At no point throughout this first investigation did Valencia receive information about the accusation. (*Id.* ¶ 50.) When Plaintiff received his second emergency suspension on March 30, 2016, the notice stated he posed an "imminent harm to students." (*Id.* ¶¶ 131–32.) Frank denied his requests for appeal, defending OEO practices and failing to provide

"substantive review." (*Id.* ¶¶ 134–37.) Throughout this ordeal, Plaintiff alleges that UNM never informed him how he placed students in immediate danger.

Next, hearings. Courts do not require full-scale judicial hearings, but they do demand a fair deliberative process. *See, e.g.*, *Mathews*, 424 U.S. at 338–39. When UNM began investigating Valencia, he was consistently kept in the dark, only receiving final OEO reports months after cases opened. Six months after the first OEO complaint against Plaintiff, he still had not received an opportunity to defend himself. (*Id.* ¶ 90.) He further alleges that OEO policy permitted investigations into 90- or 180-day-old claims, not year-old claims later thrust upon Plaintiff. (*Id.* ¶ 96.) Moreover, the average investigation was often measured in weeks, whereas Valencia's lasted six to nine months—without notice and without the opportunity to be heard. (*Id.* ¶¶ 92–100.) With the second suspension, Plaintiff takes issue with the length of the process. This suspension, despite the "stop-gap" or "short-term" nature of the measure, lasted over two months. (*Id.* ¶¶ 140–42.) The AFTC even alleged that the department committed procedural errors. (*Id.* ¶¶ 138, 140.) When Valencia questioned the length, his concerns were not addressed. (*Id.* ¶ 143.) Nevertheless, based on the OEO findings, Valencia received a letter of censure, which allowed him to return to his normal duties. (*Id.* ¶¶ 149–50.) When Plaintiff filed his own OEO complaint, he alleges that the office did nothing to investigate. He told Field that Professors Brulotte, Debenport, and Smith "engaged in a campaign to smear, discredit, and harm [his] reputation." (*Id.* ¶ 69–70.) Yet Field told Plaintiff that nothing could be done until the outstanding OEO complaints were resolved. (*Id.* ¶ 75.) Plaintiff's claims remained on hold for months, despite his attempts to seek further information.

Lastly, and fundamental to due process, is the right to be heard. Here, after the first temporary suspension, Plaintiff contends that he had no "opportunity to contest the decision." (*Id.*

¶ 47.) Vice Provost Parker responded to Plaintiff's complaint and justified the temporary suspension. (*Id.* ¶ 48.) Yet Valencia alleges that the policies Parker cited to uphold the suspension did not exist. (*Id.* ¶ 51.) When Plaintiff filed his own OEO complaints against the department, he contends that the OEO withheld positive reports supporting Valencia, suppressing his ability to defend himself and call witnesses. (*Id.* ¶¶ 100, 107.) Even more alarming, Valencia claims that the anthropology faculty pressured students against coming forward in his defense. (*Id.* ¶¶ 115–24.) After Plaintiff's case was featured in the media, the administration received additional complaints. (*Id.* ¶¶ 155–57.) Another emergency suspension was issued. (*Id.* ¶ 162.) About two weeks later, Peceny issued a termination letter to Plaintiff. (*Id.* ¶ 179.) Provost Abdallah upheld the termination on appeal, citing Peceny's use of proper UNM policy. (*Id.* ¶ 183.) At the same time, the OEO— through Jim and Cordova—absolved the three professors of any wrongdoing. (*Id.* ¶ 185.) Plaintiff claims that at no point throughout this final process did he have the chance to adequately make his case to UNM administrators.

Based on Plaintiff's pleaded facts, UNM clearly mishandled his case. Subjecting a public employee to multiple adverse employment actions—resulting in termination—without providing proper notice, discounting evidence in his defense, prolonging proceedings, going outside UNM policy, and not providing an opportunity to call witnesses violates the Due Process Clause. *See Zinermon*, 494 U.S. at 136–39 (relying on established processes the State of Florida had in place to admit patients); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." (citation omitted)). UNM had processes to handle harassment complaints and received additional guidance from the DOJ Report. Courts have said that the right to be heard is fundamental to due process, and here, it seems that Plaintiff has

not been adequately heard. Given that the named Defendants allegedly violated *clearly established* law, they are not entitled to qualified immunity.

The only Defendant named in Count III and not mentioned in the Amended Complaint, except in a conclusory manner, is Heather Cowan. Given the lack of specificity directed at this particular Defendant, the Court will dismiss the claim against her. Nevertheless, the procedural due process claim (Count III) survives for all remaining Defendants.

### e. Plaintiff failed to show a deprivation of his liberty interest (Count V).[3]

Plaintiff states that "he has a liberty interest . . . in his reputation and good standing within [UNM] and [the] nationwide academic community." (Am. Compl. ¶ 256.) Defendants, however, state that Plaintiff "fails to identify how the [i]ndividual Defendants are each allegedly responsible for depriving him of his so-called liberty interest." (Doc. 113 at 12.) Plaintiff nevertheless maintains that when allegations "impugn the reputation or integrity of the employee, are false, and occur in the process of terminating an employee or foreclose future employment opportunities, an actionable claim is stated for substantive due process purposes." (Doc. 121 at 20 (citation omitted).)

Defendants again provide the more compelling argument. Valencia claims that he has a liberty interest in his name and reputation. (*Id.*) To make out this claim: "first, the statements must impugn the employee's good name, reputation, honor, or integrity; second, the statements must be false; third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities; and fourth, the statements must be published." *Darr v. Town of Telluride, Colo.*, 495 F.3d 1243, 1255 (10th Cir. 2007) (citation omitted). This constitutional

---

[3] Plaintiff's liberty interest argument is listed in the "Substantive Due Process" category in the Amended Complaint. (Am. Compl. ¶¶ 255–63.) However, it is more appropriately analyzed against a procedural due process backdrop or separately. *McDonald v. Wise*, 769 F.3d 1202 (10th Cir. 2014).

protection only applies to statements made through the hearing process. *Id.* But here, the University's public proclamations were factual, relaying the ongoing nature of the investigation (Am. Compl. ¶ 161) and asking for additional information (*id.* ¶ 156). The character attacks that concern Valencia are those perpetrated by the anthropology faculty members not named as Defendants here—not the UNM administrators responsible for the investigation and termination. In fact, the UNM press release stated that the investigation was ongoing and that no action would be taken without additional information. (*Id.* ¶¶ 160, 161.) If any reputational harm resulted from this process, it did not originate from the administration. Therefore, the Court grants the Motion to Dismiss as to Count V.

### f. Plaintiff has not made out a Substantive Due Process violation (Counts V and VI).

Defendants next assert that Plaintiff's substantive due process theory fails to state a claim. (Doc. 113 at 12.) Substantive due process also originates from the Fourteenth Amendment's protections against governmental deprivations "without due process of law." U.S. Const. amend. XIV. This doctrine is primarily aimed at protecting "matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (citation omitted). Though broad, the Supreme Court has limited substantive due process protection to "only the most egregious official conduct" that is "arbitrary in the constitutional sense." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citation and internal quotation marks omitted). The Tenth Circuit has distinguished tortious violations from constitutional ones, arguing that constitutional violations must "shock the conscience." *Williams v. Berney*, 519 F.3d 1216, 1223 (10th Cir. 2008); *see also Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998) ("[P]laintiff must do more than show that the government actor intentionally or recklessly caused injury . . . . Instead, a plaintiff must demonstrate a degree of outrageousness and a magnitude of

potential or actual harm that is truly conscience shocking." (internal quotation marks and citations omitted)). Given that courts afford government actors wide discretion to perform their duties, only egregious torts reach a constitutional level. *Id.* at 1221.

While the Court expressed its concerns with the University's processes above, Plaintiff cannot contend that the administration's activity was "conscience shocking." Plaintiff has not adequately connected any nefarious motivation from the Defendants to his termination. Rather, the termination was the result of ongoing investigations, one of which included a sexual harassment claim. Such a complaint—again not assessing its veracity—is not arbitrary or capricious. Thus, UNM's justification was facially justified. The Court already allowed some of the procedural due process claims to stand given the erratic nature of UNM's processes. Finding a substantive due process violation requires "conscience shocking" behavior, questioning the substance of the adverse employment action. Here, the ultimate justification for dismissal—sexual harassment allegations—offers a sufficient explanation for the University's actions. Again, the root of Plaintiff's lawsuit is the UNM's insufficient processes and the defamation from fellow professors. Therefore, the Court dismisses Count VI against all Defendants.

### g. Plaintiff concedes dismissal of the §§ 1983 and 1985(3) conspiracy claims (Counts IV and VII) for insufficient pleading.

Regarding the two conspiracy claims naming both state and non-state actors, the Plaintiff no longer "contest[s] the dismissal of the conspiracy counts at this time." (Doc. 121 at 22.) Plaintiff requests to revisit the issue, in the event that discovery yields favorable evidence. The Court declines to rule on this request now, as Plaintiff would need to file an appropriate motion in the future. But considering that Plaintiff has had multiple opportunities to correct his initial Complaint,

the Court is disinclined to grant any further motions to amend. In the meantime, the Court will dismiss Counts IV and VII against all Defendants without prejudice.

## IV.     Civil Conspiracy (Count XII)

Plaintiff concedes to the dismissal of the civil conspiracy claim against the state employees. (Doc. 126 at 4.) Nevertheless, Plaintiff still supports his claim against the non-state employees: Alexandra Tacea, Joe Scearce, Laura Morris, Danielle Kabella, Kayla Ahmed, and Sarah Leister. (Doc. 126 at 4–5.) In New Mexico, civil conspiracy requires an agreement "between two or more persons to do a[n] . . . unlawful act or a lawful act by . . . unlawful means." *Armijo v. Nat'l Sur. Corp.*, 268 P.2d 339, 346–47 (N.M. 1954). While not actionable alone, civil conspiracy makes members jointly and severally liable for tortious actions stemming from the conspiracy. *Seeds v. Lucero*, 113 P.3d 859, 862 (N.M. Ct. App. 2005). That is, "an agreement by itself, without an independent, unlawful act, is not an improper means." *Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC*, 139 P.3d 201, 207 (N.M. Ct. App. 2006), *overruled on other grounds*, *Nationstar Mortg. LLC v. O'Malley*, 415 P.3d 1022 (N.M. Ct. App. 2018). To make the case, plaintiff must show that (i) a conspiracy existed, (ii) defendants carried out wrongful acts in furtherance of the conspiracy, and (iii) harm resulted from these acts. *Seeds*, 113 P.3d at 863–64.

Defendants argue that "Plaintiff has not alleged sufficient facts to imply that non-public employee Defendants engaged in a conspiracy and thus cannot make a prima facie case for civil conspiracy . . . ." (Doc. 119 at 9.) Specifically, Defendants state that "allegations against Ahmed, Kabella, and Morris all stem from their independent reports about Plaintiff to UNM but does not claim that *these* reports were coordinated in any way." (*Id.*) In Response, Plaintiff rehashes the three-pronged test from *Seeds* and then argues that non-state employee Defendants are not granted

a dismissal on the sole basis that the claims were dismissed against the state employees. (Doc. 126 at 4 (citing *Seeds*, 113 P.3d at 864).)

Plaintiff, however, skips steps in the analysis. Jumping immediately to the test in *Seeds*, he fails to expound on the first prong—whether a *conspiracy existed*. A conspiracy requires agreement or implied collective efforts from two or more people to accomplish an illegal act. *Los Alamos Nat'l Bank*, 139 P.3d at 207. Plaintiff makes no showing of agreement or joint effort. As Defendants suggest, the Amended Complaint states no facts demonstrating how the six individuals engaged in orchestrated efforts against Valencia. While Plaintiff alludes to Professors Brulotte, Smith, and Debenport "solicit[ing] students to meet with them" and "sharing confidential information," (Am. Compl. ¶¶ 120–21), he never connects the professors to Tacea, Scearce, Morris, Kabella, Ahmed, and Leister. In fact, outside of the introductory list of Defendants and the conclusory statements in each count, Plaintiff makes no mention of Tacea, Scearce, and Leister. As for the other three individuals, Plaintiff discusses their official complaints in greater detail, but he offers no facts suggesting that Morris, Kabella, and Ahmed had any interaction with each other, let alone agreed to coordinate efforts against Valencia. Without well-pleaded facts, the Plaintiff cannot make out a civil conspiracy claim. Therefore, the Court dismisses Count XII against all Defendants.

## V. Common Law Claims for Defamation and Slander Per Se (Counts XIII & XIV)

Sustaining a defamation claim in New Mexico requires: (i) published communication, (ii) with a statement of fact, (iii) concerning the plaintiff, (iv) that is false, (v) and defamatory, (vi) the recipient of the information understood it as false, (vii) the defendant knew it was false, (viii) the communication caused injury, and (ix) defendant claims statement's truth. N.M. UJI 13-1002(B). The courts offer a qualified privilege when there is a "good faith publication in the

23

discharge of a public or private duty." N.M. UJI 13-1012; *see also Mahona-Jojanto, Inc., N.S.L. v. Bank of N.M.*, 442 P.2d 783, 785–86 (N.M. 1968) (reiterating the standard). The privilege is abused when Defendant knows "the statement is false" or published it with an "improper purpose," among other reasons. N.M. UJI 13-1012; *see also Bookout v. Griffin*, 639 P.2d 1190, 1193 (N.M. 1982) (reiterating the standard).

New Mexico has incorporated slander into the definition above. *Reed v. Melnick*, 471 P.2d 178, 182 (N.M. 1970), *overruled on other grounds*, *Marchiando v. Brown*, 649 P.2d 462 (N.M. 1982). Per se defamation, or slander, occurs when the statement attributes one of the following actions to the Plaintiff: "the commission of some criminal offense involving *moral turpitude*; . . . *unfitness to perform duties* of office or employment for profit, or the want of integrity in discharge of the duties of such office or employment; some falsity which prejudices plaintiff in his or her profession or trade . . . ." *Id.* (citing *Marchiondo v. N.M. State Tribune Co.*, 648 P.2d 321, 326–27 (N.M. Ct. App. 1981)).

### a. Brulotte, Smith, and Debenport were not acting within the scope of their duties and are subject to civil liability. Sena was acting within the scope of his duties.

Defendants contend that because they are public employees, they are not susceptible to civil liability. (Doc. 117 at 5–8.) The Court disagrees in part. As in the § 1983 context, state officials are entitled to immunity under the New Mexico Tort Claims Act (NMTCA), N.M. Stat. Ann. § 41-4-17(A), for actions that are within their "scope of duty," N.M. Stat. Ann. § 41-4-3(G). Specifically, this means "performing any duties that a public employee is requested, required or authorized to perform by the governmental entity, regardless of the time and place of performance." *Id.* The Court's "focus is on the employee's *duty* as it relates to the at-issue act; the inquiry does not turn upon whether the act itself was requested, required, or authorized by the employer." *Urrutia v. Montoya*, No. 16-CV-25-MCA-SCY, 2016 WL 10179341, at *3 (D.N.M.

Sept. 19, 2016) (citing *Risk Mgmt. Div. v. McBrayer*, 14 P.3d 43, 46–48 (N.M. Ct. App. 2000)). Courts ultimately require a "connection between the conduct and the duties that the employee was requested, required, or authorized to perform on behalf of the public entity." *Id.* at *2 (citation omitted).

Defendants argue that the NMTCA only "waived sovereign immunity for a limited number of statutorily-defined torts." (Doc. 117 at 5 (citation omitted).) To face civil liability, the actions must occur outside one's "scope of duty." Defendants explain that the defamatory statements were "encountered through their official positions and concerned [Plaintiff's] fitness to work in the university setting." (*Id.* at 8.) Plaintiff counters that these employees "can show no connection to their duties assigned by the University and the Department of Anthropology." (Doc. 127 at 7.)

The Court generally agrees with Plaintiff but recognizes a few separate issues at play. First, Defendant Sena's circumstances are different from the other three Defendants. His only involvement in this saga was filing a claim with the administration regarding a "drunken assault and battery" involving Plaintiff. (Am. Compl. ¶ 166.) UNM determined that no probable cause existed linking Plaintiff to this claim, but filing an OEO complaint through institutional channels falls within the scope of his duties. *Urrutia*, 2016 WL 10179341, at *3 (examining New Mexico "scope of duty" cases). The analysis turns on whether the employment duties "create the opportunity for the employee's tortious conduct." *Id.* Sena's position allowed him to access UNM processes to file his complaints. Plaintiff's problem is less about the complaint itself, and more about how the University handled the complaint. Therefore, Defendant Sena is immune to Plaintiff's defamation claim, so the Court will dismiss Count XIII against him.

Second, the Court must look at the defamation claim as it pertains to Brulotte, Smith, and Debenport. Here, the Court finds that Plaintiff alleges sufficient facts to survive the motion to

dismiss. Defendant Brulotte told students that Valencia was "under investigation for 'sexual predation.'" (*Id.* ¶ 84.) Later, students saw Brulotte and Debenport at a restaurant celebrating their attempts to "take Valencia down." (*Id.* ¶ 128.) Allegedly, Brulotte, Debenport, and Smith sought out students to discuss the confidential Valencia situation. (*Id.* ¶ 121.) The three professors meanwhile communicated with media sources. (*Id.* ¶ 164.) And Brulotte even "posted a photograph of Valencia on Facebook with the caption, 'I am a sexual predator.'" (*Id.* ¶ 175.) These statements were purported to be factual and were shared with third parties. Plaintiff suffered a series of adverse employment actions, and at this stage of litigation, he adequately ties his allegations to statements from these three professors.

The primary issue, however, is whether these professors acted within the scope of their duties at UNM. Admittedly, the Court cannot evaluate their contracts at this point, but it can fairly surmise that Facebook posts and public celebrations regarding serious allegations against a colleague do not appear in their job descriptions. Defendants' actions went beyond showing concern with Plaintiff's "fitness to work in the university setting." (Doc. 117 at 8.) It is true that these professors were in a unique position to learn about the circumstances of Plaintiff's investigation, but that does not excuse these claims. Liability turns on the "employee's *duty* as it relates to the at-issue act," not necessarily whether the employer "requested, required, or authorized" it. *Urrutia*, 2016 WL 10179341, at *3 (citation omitted). Here, it cannot be said that UNM authorized or sanctioned any of this behavior. The question is then whether these sorts of statements and posts are tied to their roles in the anthropology department. Given that these statements (i) occurred in private settings outside the context of formal or even informal university meetings (ii) and included embellished content, they fall outside Defendants' scope of duties.

Therefore, the defamation claims (Count XIII) against Brulotte, Debenport, and Smith survive the motion to dismiss.

Finally, the Court must treat slander per se separately from the defamation claim. Slander requires specific defamatory content to find liability; doing so avoids the need to prove actual damages. This claim is only levied against Brulotte and Debenport.[4] (Am. Compl. ¶ 334.) Plaintiff alleges that these professors were in contact with students in person and via social media, sharing that he was a sexual predator. He further claims that they spoke with news organizations to provide the same information. These are serious allegations that have the potential to permanently damage a reputation; they certainly implicate issues of "moral turpitude" and an inability to perform job duties. Therefore, the Court finds Plaintiff sufficiently pled facts against Brulotte and Debenport to survive the motion to dismiss for Count XIV.

### b. Kabella, Ahmed, and Morris's defense pursuant to the *Noerr-Pennington* Doctrine is not appropriate in this case.

Defendants exclusively leverage the *Noerr-Pennington* doctrine to argue for immunity from a defamation suit because they petitioned the government through formal UNM channels. (Doc. 117 at 8–11.) The *Noerr-Pennington* doctrine originates from the Sherman Antitrust Act. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). Yet over the years, this doctrine crept outside the narrow corridors of antitrust law. *See BE & K Const. Co. v. NLRB*, 536 U.S. 516, 528–33 (2002) (applying the doctrine's reasoning in the context of the National Labor Relations Act). Still, the Supreme Court has not explicitly applied *Noerr-Pennington* outside its original application.

---

[4] Plaintiff also includes Tacea and Leister in Count XIV, but the Court later dismisses these claims. *See infra* Section V(c).

Sister circuits have adopted a give-an-inch-take-a-mile approach since *BE & K. See, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938–39 (9th Cir. 2006) (applying *Noerr-Pennington* to RICO Act claims); *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 (5th Cir. 2000) (extending *Noerr-Pennington* to § 1983 claims). But the Tenth Circuit applies the doctrine cautiously. *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889–90 (10th Cir. 2000) ("[I]t is more appropriate to refer to immunity as *Noerr-Pennington* immunity only when applied to antitrust claims. In all other contexts . . . such immunity derives from the right to petition."). The court held that applications outside the antitrust context stemmed from the constitutional right to petition the government, and not the statutory right derived from the Sherman Antitrust Act. *Id.* at 889. Consequently, the *Cardtoons* court found guidance in *McDonald v. Smith*, 472 U.S. 479 (1985), to address the lingering constitutional issues.

The Tenth Circuit has limited *Noerr-Pennington* more so than sister circuits. The motion to dismiss applies it in a novel manner outside the antitrust context, and it extends the doctrine beyond what the Tenth Circuit has endorsed. Defendants may make arguments based on their right to petition the government, but because *Noerr-Pennington* has limited application and because the parties briefed only this narrow issue, the Court must deny Kabella, Ahmed, and Morris's motion as to Count XIII.

### c. Plaintiff does not state claims against Tacea, Scearce, and Leister.

A complaint does not require the utmost detail, but it must contain a "short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Defendants argue that Plaintiff provides only conclusory accusations against Tacea, Scearce, and Leister, with barely a mention throughout the Amended Complaint. (Doc. 117 at 11.) Plaintiff counters that he pleads specific instances of defamation. (Doc. 127 at 10.)

The Court agrees with Defendants. Over the course of 19 pages and 166 paragraphs in the Amended Complaint's "Factual Allegations" section recounting the years-long odyssey of administrative mismanagement, Plaintiff makes no mention of Tacea, Scearce, and Leister. (Am. Compl. ¶¶ 29–195.) Plaintiff cites paragraphs 321, 322, 324, and 329 in his Amended Complaint to offer support of his defamation claims. (Doc. 127 at 10.) In assessing Plaintiff's response, the Court only sees vague allegations against these three Defendants. Claiming that "[Defendants] published to third persons defamatory remarks" fits the textbook definition of conclusory. (Am. Compl. ¶ 321.) That these Defendants "engaged in such intentional and malicious defamation for the purposes of causing damage to Valencia's reputation" offers the Court no detail about Tacea, Scearce, and Leister's behavior. (*Id.* ¶ 324.) That they may have made comments of a "similar nature" to Brulotte, Smith, and Debenport is also insufficient. (*Id.* ¶ 329.) Plaintiff drops Scearce from consideration altogether. The extensive Amended Complaint makes several serious allegations throughout, but the Court will not allow for such hapless pleading meant only to bloat the Defendant count. Therefore, the defamation claims (Count XIII) against Tacea and Scearce are dismissed. And the slander per se claims (Count XIV) against Tacea and Leister are also dismissed.

## VI.    Conclusion

Despite the attempts to fix the Complaint, much of it still includes conclusory statements not meeting the federal pleading standards. All told, this Opinion addressing the three motions to dismiss involves 10 counts alleged against 22 defendants for a total of 121 unique claims. For the sake of simplicity, the Court will only summarize the claims remaining.

First, the Court found Plaintiff sufficiently pled facts demonstrating severe mishandling of the University's various inquiries into allegations against him. As a result, the procedural due

process claims (Count III) remain against Frank, Abdallah, Parker, Peceny, Field, Cordova, Buchs, Jim, and Fulghum.

Second, the Court found that Plaintiff sufficiently pled facts that allow his defamation claims to move forward against the three professors, Brulotte, Debenport, and Smith, who made statements throughout the various investigations. Additionally, Defendants misapplied the *Noerr-Pennington* doctrine in arguing for immunity. Thus, the defamation claims (Count XIII) remain against Brulotte, Debenport, Smith, Kabella, Ahmed, and Morris.

Finally, the Court found that the content of Brulotte and Debenport's statements against Plaintiff fit within the moral turpitude category, which leaves the slander per se claims (Count XIV) against these two professors.

**THEREFORE**,

**IT IS ORDERED** that Defendants' Motion to Dismiss Plaintiff's Pursuant to Federal Rule of Civil Procedure 12(b)(6) and on the Ground of Qualified Immunity (Doc. 112) is **GRANTED** as to Counts I, II, IV, V, VI, and VII for all Defendants, and Count III for Defendants UNM and Cowan, and **DENIED** as to Count III for Frank, Abdallah, Parker, Peceny, Field, Cordova, Buchs, Jim, and Fulghum.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Plaintiff's Common Law Claims for Civil Conspiracy (Doc. 118) is **GRANTED** as to Count XII for all Defendants.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Plaintiff's Common Law Claims for Defamation, Civil Conspiracy, and Slander Per Se (Doc. 116) is **GRANTED** as to Count XIII for Tacea, Scearce, and Sena, and Count XIV for Tacea and Leister, and **DENIED** as to Count XIII for Brulotte, Debenport, Smith, Ahmed, Kabella, and Morris, and Count XIV for Brulotte and Debenport.

**IT IS FURTHER ORDERED** that Tacea, Scearce, Sena, Olguin, and Leister are **DISMISSED** from the lawsuit.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**