**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CHRISTOPHER VALENCIA,

      Plaintiff,

   v.                                                                                          No: 1:17-cv-509-RB-SCY

THE BOARD OF REGENTS, University
of New Mexico, ROBERT FRANK, in his individual
capacity, CHAOUKI ABDALLAH, in his individual
capacity, CAROL PARKER, in her individual capacity,
MARK PECENY, in his individual capacity, LES
FIELD, in his individual capacity, RONDA BRULOTTE,
ERIN DEBENPORT, LINDSAY SMITH, FRANCIE
CORDOVA, in her individual capacity, LAURA LYNN
BUCHS, in her individual capacity, HEATHER COWAN,
in her individual capacity, AARON JIM, in his individual
capacity, ALEXDANDRA TACEA, KAYLA AHMED,
DANIELLE KABELLA, JOE SCEARCE, LAURA
MORRIS, JULIA FULGHUM, in her individual
capacity, ALBERT SENA, DENNIS OLGUIN, and
SARAH LEISTER,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Valencia's time as a professor in the University of New Mexico's (UNM) anthropology department began without incident. His tenure was later marred, however, by allegations of sexual harassment and discrimination. After an extensive investigation, UNM terminated his employment contract. Valencia then filed suit, alleging flaws in the investigation and discriminatory bias. Defendants now bring three Motions for Summary Judgment related to Valencia's claims. (Docs. 194; 196; 198.) After evaluating the record, the Court concludes that Valencia received constitutionally adequate procedural due process and that his Title VII discrimination claims have no evidentiary support. Given that Valencia's remaining claims are

rooted in state law, the Court declines to exercise supplemental jurisdiction and will dismiss the case.

I. **Background**

Defendant UNM Board of Regents hired Valencia into the anthropology department in 2012. (Doc. 83 (Am. Compl.) ¶¶ 30–31.) Valencia performed his duties without incident for three years. (*Id.* ¶ 35.) On June 15, 2015, Defendant Les Field, department chair, told Valencia that students had filed a complaint against him with the university's Office of Equal Opportunity (OEO). (*Id.* ¶ 37.) The OEO presented a formal complaint to Valencia in September 2015. (Doc. 197-1 at 15–16.) In an email, Field told Valencia that Defendants Dean Mark Peceny and Julia Fulghum requested Valencia's recusal from grading comprehensive exams for the 2015–2016 year because of the OEO investigation. (Am. Compl. ¶ 42.) Valencia was given a temporary suspension as this process continued. (*Id.* ¶ 48.) In response, Valencia filed complaints related to internal anthropology department harassment and bias, and the OEO opened a parallel investigation. (Doc. 197-1 at 16 n.3.)

Valencia learned about the substance of the complaints in September 2015. (*Id.* at 16.) Several students alleged sexual orientation discrimination, sexual harassment, and gender discrimination. (*Id.* at 16–22.) One of the individual complaints against Valencia was initially found to lack probable cause standing on its own, but the university ultimately determined that in the context of numerous other complaints, it exhibited evidence of a pattern of inappropriate behavior. (*Id.* at 26–27.)

After months of investigating, the OEO released its findings in March 2016. (*Id.* at 15.) The OEO found that some of the allegations against Valencia lacked corroboration but found probable cause to believe that Valencia had engaged in discriminatory conduct based on sexual

orientation and gender identity, and that Valencia subjected students to a sexually-harassing and hostile academic environment. (*Id.*) After the OEO released its findings, Valencia received a censure and notice of emergency suspension. (*See* Docs. 206-4 at 16:15–24; 206-12.)

In August 2016, Peceny met with Valencia and his attorney, solicited supplementary material, interviewed witnesses, and studied the OEO Report. (Doc. 197-1 at 13.) After this review, Peceny recommended terminating Valencia's employment contract with UNM for cause. (*Id.*) Valencia appealed Peceny's recommendation to the Provost, Defendant Chaouki Abdallah. (*Id.* at 29.) Abdallah also met with Valencia and his attorney, asked for additional material, and thoroughly reviewed the evidence. (*Id.*) He decided to accept Peceny's recommendation and officially terminated Valencia's contract as of November 1, 2016. (*Id.* at 30.) In his termination letter, Abdallah explained his decision-making process and invited Valencia to appeal. (*Id.*)

As a result of the termination, Valencia sought review from the Academic Freedom and Tenure Committee (AFTC). (*Id.* at 31.) In December 2016, the AFTC issued a letter stating that: "Based upon the information provided to the full Committee by the [AFTC] investigative subcommittee and the full Committee's careful consideration of and deliberation on your complaint, the [AFTC] has determined that there are insufficient grounds" to overturn the Provost's decision. (*Id.*) Valencia appealed the AFTC decision, and in March 2017, the AFTC reconsidered the evidence and issued a ruling denying his request for review. (*Id.* at 32.)

Valencia subsequently filed this lawsuit implicating Title VII and various constitutional claims through 42 U.S.C. § 1983. Plaintiff also alleges supplemental state claims including breach of contract, defamation, slander per se, and New Mexico Human Rights Act abuses. Federal jurisdiction arises under 28 U.S.C. §§ 1331 and 1367. The Court issued previous opinions demanding that Valencia clarify aspects of his Complaint, so that it was clear which claims were

waged against particular Defendants. (Doc. 82.) In November 2019, the Court dismissed several claims but ruled that Valencia pleaded sufficient facts to proceed with others. (Doc. 138.) Now in three separate motions, Defendants ask the Court to grant summary judgment on the remaining claims in Valencia's Amended Complaint.

## II. Legal Standards

### a. Summary Judgment

The Court may grant a motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Genuine issues of fact are those that "a rational trier of fact could resolve . . . either way," and material facts are "essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted). The parties must provide support, and the Court will make all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears the initial responsibility of showing "that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party does so, "the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine triable issue." *Johnson v. City of Roswell*, 752 F. App'x 646, 649 (10th Cir. 2018) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013)).

### b. Qualified Immunity

Section 1983 provides that: "Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . ." 42 U.S.C. § 1983. The Tenth Circuit has held that state employment does not automatically impute state authority on an action; rather, the employee must act through the state or give the impression that state authority was behind the action. *Jojola v. Chavez*, 55 F.3d 488, 493 (10th Cir. 1995). The state and its agencies, however, are shrouded with Eleventh Amendment immunity in federal court. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989). Individual officers sued in their personal capacity, on the other hand, receive qualified immunity. *Hafer v. Melo*, 502 U.S. 21, 28 (1991). This doctrine recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978)). To defeat qualified immunity, plaintiffs must show that an official's actions "violate[d] *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818 (citations omitted) (emphasis added). *Clearly established* means that "there must be a Supreme Court or Tenth Circuit decision on point, or the *clearly established* weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (quoting *Medina v. City & Cty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)).

### III. Procedural Due Process Claim (Count III)

The Fourteenth Amendment reads: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. In analyzing a procedural due process claim, a court will evaluate (i) whether a protected property or liberty interest was at issue and (ii) whether appropriate processes were in place to protect the individual. *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1219 (10th Cir. 2006). Property interests require "a legitimate claim

of entitlement . . . ." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The court must "ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure . . . and any remedies for erroneous deprivations provided by statute or tort law." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). The central tenets of procedural due process are (i) notice, (ii) the right to be heard, and (iii) a hearing. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). In addition, courts look at the private interest affected; the risk of deprivation through existing procedures and the value of additional measures; and the burden placed on the government to adopt such safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### a. Defendants have presented sufficient evidence to show that Valencia's constitutional due process rights were not violated.

At the outset, the Court finds that Defendants correctly assert that Valencia only has a property interest in his employment as it pertains to the final employment decision. While he was suspended during portions of the investigation, those suspensions were *with pay*. (Doc. 199 at 13.) The Tenth Circuit has held that "suspension with pay [does] not invade any recognized property interest." *Pitts v. Bd. of Educ. of U.S.D. 305, Salina, Kansas*, 869 F.2d 555, 556 (10th Cir. 1989). As a result, while Valencia refers to several violations during the investigation, the Court only needs to look at UNM's processes through the lens of its final termination decision.

At the summary judgment stage, the burden first rests with Defendants to supply evidence showing that Valencia received adequate due process. *See Bacchus Indus., Inc.*, 939 F.2d at 891. The first requirement is that the employee receive oral or written notice of the charges prior to any hearing. *See Loudermill*, 470 U.S. at 546. The Supreme Court does not require that this notice be issued far in advance; in fact, notice may occur as late as the night before a hearing. *See Goss v.*

*Lopez*, 419 U.S. 565, 582 (1975). Here, Valencia was informally made aware of allegations against him in June 2015 when Field told him about the OEO complaints. (Am. Compl. ¶ 37.) A formal notice arrived from the OEO in September 2015, which included a description of the process, as well as instructions for how to respond to the questions presented. (Docs. 197-1 at 16; 206-17 at 3.) The current case closely followed the procedures employed in *Sanchez v. Jimenez*, where a prison official was formally made aware of the charges against him and urged to contact union officials prior to a misconduct hearing. *See* No. CV 12-1122 KG/WPL, 2014 WL 12783070, at *9 (D.N.M. Dec. 19, 2014). Similarly, once the OEO Report was formally issued in March 2016, apprising Valencia of the evidence against him, he had months to provide the ultimate decisionmakers—Peceny and Abdallah—with counterevidence to support his defense. (Doc. 197-1 at 16.) Thus, given the lengthy process, the Court strains to see how Valencia could now claim that he lacked sufficient notice of the charges.

Part and parcel with the notice requirement, courts demand that the employee is fully aware of the employer's evidence against him. *See Loudermill*, 470 U.S. at 546; *see also Sanchez*, 2014 WL 12783070, at *9 (employee received information regarding the investigation into his misconduct prior to a hearing on his termination). Here, the OEO Report states that Valencia was aware of the complaints made against him informally in June 2015 and formally in September 2015. (Doc. 197-1 at 16.) Valencia admits as much in his Amended Complaint. (Am. Compl. ¶ 56.) The formal notice provided Valencia with information regarding the nature of the investigation. And when the Report was issued in March 2016, he was made fully aware of the evidence against him. (Doc. 197-1 at 15–16.) Thus, he had several months' notice that an investigation was taking place, and then several more months after evidence against him was released before the termination decision occurred.

Second, the employee must have the opportunity to present his side of the story. *Loudermill*, 470 U.S. at 546; *Abreu v. N.M. Children, Youth & Families Dep't*, 797 F. Supp. 2d 1199, 1233–35 (D.N.M. 2011) (applying the standard). In *Sanchez*, after a prison employee was made aware of pending charges against him, he met with a prison official, accompanied by his union representative. 2014 WL 12783070, at *9. The official then recommended termination. *See id.* The Court held that the process offered sufficient opportunity for the employee to share his side of the story. *See id.* Here, Valencia was invited to provide evidence at the outset, when he was made aware of the OEO investigation. (Doc. 197-1 at 16.) The OEO issued questions (that Valencia answered) and welcomed additional evidence. (*Id.*) All of this information was compiled and included in the March OEO Report. (*Id.*) After its release, Valencia had two more occasions to meet with university officials and share exculpatory evidence to counter the findings of the OEO Report. First, in August 2016, he and his attorney met with Dean Peceny, who evaluated the additional questions and documentation submitted on behalf of Valencia. (*Id.* at 13.) Peceny recommended termination, at which point Provost Abdallah met with Valencia and his attorney in September 2016. (*Id.* at 29.) The Provost accepted additional evidence from Valencia but concluded that termination was the appropriate step. (*Id.*) Given the multiple opportunities to provide exculpatory evidence, the Court finds Valencia was afforded numerous, adequate opportunities to share his side of the story. The OEO, Peceny, and Abdallah all gave Valencia chances to supply evidence prior to his termination, which nonetheless proved insufficient to counterbalance the evidence offered against him.

Through his Title VII claims, Valencia indicates that the decisionmakers exhibited bias in terminating his employment, which implicates procedural due process concerns related to the lack of a neutral arbiter. *Patrick v. Miller*, 953 F.2d 1240, 1245 (10th Cir. 1992) (holding that a plaintiff

may allege denial of procedural due process by providing evidence that the employer denied him an impartial tribunal). To succeed on this theory, Valencia would have to show that Peceny and Abdallah had already made up their minds regarding his termination at the time of their respective hearings. *Id.*; *see also Staton v. Mayes*, 552 F.2d 908, 915 (10th Cir. 1977) (showing how a partial tribunal fails to meet the demands of due process). Defendants have provided evidence, however, that suggests these individuals acted fairly and objectively in reviewing the evidence and making the decision to terminate Valencia. (Doc. 197-1 at 13, 29.) They looked at the OEO Report, as well as the documentation that Valencia provided, before deciding to terminate the employment contract. (*Id.*) Thus, Valencia would need to offer evidence showing that their decisionmaking was biased, *Miller*, 953 F.2d at 1245, and he provides nothing to substantiate such a claim.

Finally, from a post-termination standpoint, Valencia had a chance to appeal the decision. (Doc. 197-1 at 30–31.) The Tenth Circuit has declared that limited pre-termination procedures must be bolstered by stringent post-terminations procedures, *Copelin-Brown v. N.M. State Pers. Office*, 399 F.3d 1248, 1255 (10th Cir. 2005). Here, not only were the pre-termination procedures thorough, but also Valencia was invited to provide exculpatory evidence on multiple occasions both during and after the investigation. (*See, e.g.*, Docs. 197-1 at 13, 16, 29; 205-13; 205-14; 206-17.) Once the OEO Report was filed, Valencia's attorney submitted a report on his behalf to Peceny. (Docs. 197 at 13; 205-13 at 1.) After his termination, he appealed to the AFTC, and Valencia's attorney again submitted an extensive report laying out Valencia's version of events. (Doc. 205-14.) The appeals body evaluated the decision and supporting evidence but determined that overturning the Provost's decision was unwarranted given the lack of exculpatory evidence provided. (Doc. 197-1 at 32–33.) In evaluating Defendants' motions, the Court finds that they have

9

demonstrated that Valencia received adequate process throughout the investigation, and that his ultimate termination was the result of a fair, deliberative process.

### b. Valencia does not show that any factual issues remain regarding his procedural due process claim.

In response to Defendants' Motion for Summary Judgment, Valencia has the opportunity to prove that material issues of fact remain, and he offers three primary arguments to show how the process he received was deficient. The Court, however, is not convinced. First, Valencia states that he had no opportunity to respond to the allegations made in the OEO Report prior to its publication. (Doc. 206 at 19.) The Supreme Court has held that an employee must have an opportunity to respond "at a meaningful time and in a meaningful manner," *Matthews*, 424 U.S. at 333, yet courts have consistently ruled that a formal evidentiary hearing is not required prior to an adverse employment decision, *Loudermill*, 470 U.S. at 545 (citing *Mathews*, 424 U.S. at 343). The Tenth Circuit has even held that the requirements for "pretermination hearings are not very stringent," and even brief meetings or consultations satisfy the requirement. *West v. Grand Cty.*, 967 F.2d 362, 368 (10th Cir. 1992). Here, there was an extensive process lasting nearly a year, beginning with the September 2015 notice where the OEO provided Valencia an opportunity to respond. (*See* Docs. 197-1 at 16; 206-17.) In fact, the final OEO Report states that Valencia was invited to sit down and speak with OEO representatives, but chose only to answer questions via email. (*Id.*) He now argues that he did not have a chance to refute the conclusions of the OEO Report between its preliminary release and its final (non-public) publication. (Doc. 206 at 19–20.) Due process, however, is not so strict. It only requires some opportunity to respond and a hearing prior to the termination decision, which occurred in October 2016 in this instance. The OEO Report merely amounted to charges or findings. (Doc. 197-1 at 15–22.) The employee's opportunity to respond need only occur before the final termination decision, and Valencia had multiple

opportunities to respond prior to October 2016. Thus, Valencia's argument has no constitutional basis.

Next, Valencia states that the termination letter from Abdallah shows that no additional investigation was conducted based on his claims of bias. (Doc. 206 at 20.) The Court views this complaint similarly—that Valencia believes that he was not adequately heard. But again, this specific grievance has no factual grounding. The OEO Report states that when Valencia was formally notified of the investigation in September 2015, the OEO (i) provided him with information about the process and (ii) a series of questions and information that Valencia could provide. (Doc. 197-1 at 16.) Moreover, through its assertions and the records provided, the OEO opened a separate investigation into Valencia's claims of bias. (*Id.*) When the OEO Report was formally released, Peceny gave Valencia another opportunity with counsel present to inform the university's final decision. On August 9, 2016, Peceny met with Valencia and his attorney. (Doc. 197-1 at 13.) In addition, he reviewed Valencia's submissions, and interviewed many of the witnesses in the OEO Report. (*Id.*) At that point the recommendation was made to terminate Valencia. (*Id.*) In addition to those steps, Abdallah reviewed documents provided by Valencia and his attorney. (*Id.* at 29.) The pre-termination procedures were extensive and included documents, interviews, and questionnaires—providing Valencia numerous opportunities to address his concerns. That Abdallah did not begin a new investigation after meeting with Valencia has no constitutional significance. The Court looks at the entire process in light of the final termination decision and concludes that Valencia had multiple occasions to respond.

Finally, Valencia alleges that news stories and new allegations, which he had no chance to refute, drove UNM to terminate his employment. (Doc. 206 at 20.) While it is true that Peceny's letter mentions that he was made aware of additional allegations after the OEO Report was filed,

11

his letter also cites several for-cause reasons to terminate Valencia's employment based on the formal investigation and OEO Report. (Doc. 197-1 at 13.) Peceny wrote that he relied on the OEO Report and the interviews with witnesses. (*Id.*) Further, Peceny's recommendation was not a final decision. Valencia had another opportunity to provide exculpatory evidence when he met with Provost Abdallah in the wake of Peceny's recommendation. (*Id.* at 29–31.) Abdallah's termination letter makes no mention of these new allegations and instead relies on the formal investigation and OEO Report as the basis for the termination. (*Id.*) And despite Abdallah acknowledging awareness of the new allegations (Doc. 206-10 at 38:1–4), Valencia would need to show that Abdallah's decision was based on these new findings, and he offers no such evidence. *See, e.g.*, *Young v. Dep't of Hous. & Urban Dev.*, 706 F.3d 1372, 1376 (Fed. Cir. 2013) (holding that notice no longer exists when decisionmakers consider new information); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 566 (6th Cir. 2004) (same).

The Court must make its determination in light of the evidence provided and not based solely on plaintiff's perception of that evidence. While Valencia's Complaint and briefing made various allegations regarding the deficient procedures at UNM, in evaluating the record at this stage, the Court finds that these allegations are unsupported. Rather than offer the Court evidence proving UNM's deficient procedures and bias, Valencia rehashes the same conclusory statements and remarks he supplied to the OEO, Peceny, Abdallah, and the AFTC. It is now clear to the Court that UNM did not ignore Valencia's side of the story, but rather, Valencia provided no evidence to support his side of the story. UNM conducted a sweeping investigation, attempting to incorporate information from all parties, which ultimately resulted in Valencia's termination. The Court finds that no constitutional violation occurred in this case, so there is no need to analyze

whether the right at issue was clearly established. As a result, the Court will grant Defendants' Motion for Summary Judgment as to Count III.

## IV. Title VII Claims

### a. National Origin and Gender Discrimination Claims (Counts XV and XVII)

Defendants next move for summary judgment on claims of national origin and gender discrimination. (Doc. 196.) Title VII states that employers are not allowed to "to limit, segregate, or classify [their] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The employee must first establish the *prima facie* case of unlawful discrimination or retaliation. A plaintiff generally must show (1) that he is a member of a protected class based on his national origin or gender, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently. *See Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998); *see also Grossete v. City of Albuquerque Open Space Police Dep't*, No. CV 06-634 MCA/DJS, 2007 WL 9709788, at *5 (D.N.M. Sept. 28, 2007) (applying this framework). This is a "flexible standard that may be modified to accommodate different factual situations." *Perry v. Woodward*, 199 F.3d 1126, 1140 n.10 (10th Cir. 1999) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977)). If the employee establishes the *prima facie* case, then the burden shifts to the employer to offer a nondiscriminatory reason for the adverse action. *Trujillo*, 157 F.3d at 1215; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). If that burden is met, then summary judgment is warranted unless the employee can show a genuine issue of material fact that the employer's

explanation is pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–49 (2000); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

At the outset, Valencia must make a prima facie case for discrimination. Defendants do not contest the first two elements: (i) "that [Valencia] is Hispanic and that his gender is male" and (ii) that his termination constituted an adverse action. (Doc. 197 at 8.) Yet Valencia fails to meet the final element, providing no evidence that other employees in the OEO process were treated differently because of their status.

Even if Valencia could make out the prima facie case, the Defendants provide sufficient documentation to show that the termination had a nondiscriminatory basis. (Doc. 197-1.) Specifically, Dean Peceny's termination recommendation cites the OEO Report and its findings as the reason for Valencia's termination. (*Id.* at 13–14.) And the OEO investigation was the basis for the previous suspensions. (*Id.*) Further, Provost Abdallah used the same evidence to accept Peceny's recommendation and terminate Valencia's contract. (*Id.* at 29.) In reviewing the Report, OEO contacted 44 potential witnesses and interviewed 32 individuals. (*Id.* at 16.) The first section of the Report found that Valencia engaged in differential treatment, whereby he showed favorable treatment to students who "presented themselves in a 'feminine way'" and favored students "as a means to develop relationships with them that could lead to sexual activity." (*Id.* at 17.) The next section found that Valencia was "dismissive" of and spent little time with LGBTQ students, as they did not fit his "type." (*Id.* at 18.) The OEO Report continues with additional examples of Valencia engaging in inappropriate relationships and even acting in a "sexually aggressive" manner toward some students. (*Id.* at 20.) The Court does not need to offer an opinion on this investigation—only that the termination decision was based on these nondiscriminatory findings.

The OEO Report cites various instances of inappropriate behavior that the university claims violate their policies, giving UNM nondiscriminatory grounds to terminate Valencia's employment.

Therefore, the burden shifts to Valencia to show that the nondiscriminatory rationale Defendants offer is pretextual. *Kendrick*, 220 F.3d at 1226. Again, he fails to meet this burden. To support his claims he provides various emails sent to UNM officials, claiming that he was subject to a hostile work environment and that these adverse actions are the product of discrimination. (*See* Docs. 205-4; 205-5; 205-6.) None of these conclusory statements, however, provide specific information or instances of such discrimination. In his deposition, Valencia claimed that "[a]s the only Chicano male in the anthropology department, I saw a culture of judging others based on stereotypes" and that "there was a tendency to be very critical of faculty of color for the type of research that they wanted to do." (Doc. 205-7 at 291:8–25.) Later, he stated that certain work, such as promoting diversity in hiring, was frequently left to Valencia as the only Hispanic member of the department. (*Id.* at 292:19–293:12.) While these examples might show other issues within the department, they neither refute Defendants' contention that the termination was made for nondiscriminatory purposes, nor demonstrate how such action was pretextual.

In sum, Valencia has offered no evidence that shows how his termination was based on discriminatory behavior. Nowhere in the record does Valencia connect his termination with discriminatory conduct from any of the Defendants. Therefore, the Court will grant Defendants' Motion for Summary Judgment as to Counts XV and XVII.

### b. Retaliation (Count XIX)

Defendants next move for summary judgment on the Title VII retaliation claim. (Doc. 197 at 10–11.) To prove retaliation, a plaintiff must show: (1) he engaged in "protected opposition to discrimination"; (2) "a reasonable employee would have found the challenged action materially

adverse"; and (3) the activity caused the adverse action. *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)). To show this, the plaintiff can provide evidence of motive and temporal proximity. *Id.*; *see also Walton v. N.M. State Land Office*, 113 F. Supp. 3d 1178, 1190 (D.N.M. 2015).

This analysis, though slightly different from that used to determine the previous Title VII claims, relies on the same evidence and produces the same outcome. Valencia correctly asserts that his filing of an OEO complaint against the department and its faculty constitutes a protected activity, and his suspensions and ultimate termination constitute adverse actions taken against him. But he cannot satisfy the final element, which requires a causal connection between the protected activity and the adverse action.

Defendants argue that the "fact that an employee previously filed a complaint and later suffered an adverse action does not mean the plaintiff can defeat summary judgment." (Doc. 197 at 10 (citing *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234–35 (10th Cir. 2015)).) Defendants again show how Peceny and Abdallah relied on the OEO Report, interviews, and other evidence to justify Valencia's termination. Defendants show that the termination was the result of Valencia's own conduct: his inappropriate relationships with students, his favoritism, and his mistreatment of students. (Doc. 197-1 at 15.) Nothing in the Report or termination letters offers even a hint that the termination was retaliatory or a reaction to Valencia's claims of racial bias in the department. In fact, Valencia's claims of racial bias were largely filed in tandem with the harassment claims against him. Valencia asserts throughout his communications with UNM officials that he was the victim of racial bias, but like the previous Title VII claims, he supplies nothing more than conclusory statements and allegations. (*See* Docs. 205-4; 205-5; 205-6.) The Tenth Circuit held in

*Luster v. Vilsack* that Title VII claims must be objective, that courts assess these situations based on facts and not through the lens of the plaintiff. *See* 667 F.3d 1089, 1093 (10th Cir. 2011). Valencia has had multiple opportunities to provide evidence connecting his alleged mistreatment in the department with his termination. However, at the summary judgment stage conclusory allegations will not suffice. As a result, the Court will grant Defendants' Motion for Summary Judgment for Count XIX.

## V.     State Law Claims

After granting summary judgment on the federal claims, the only remaining claims are based in state law: breach of an implied contract[1] (Count VIII), breach of an express contract (Count IX), violations of the New Mexico Whistleblower Protection Act (Count X), breach of good faith and fair dealing (Count XI), defamation (Count XIII), slander per se (Count XIV),[2] violations of New Mexico Human Rights Act (NMRHA) for national origin discrimination (Count XVI), violations of NMHRA for gender discrimination (Count XVIII), and violations of the NMHRA for retaliation (Count XX). Given that this body has only limited jurisdiction, the Court will not exercise supplemental jurisdiction over standalone state law issues. *See* 28 U.S.C. § 1367(c)(3). As a result, the Court will dismiss these claims without prejudice.

**THEREFORE**,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 198) is **GRANTED IN PART** as it relates to the federal claim (Count III), and this claim is **DISMISSED**

---

[1] Both parties discuss the breach of an implied contract claim (Docs. 199; 206), but they refer to it as Count VII. In Valencia's Amended Complaint, Count VII refers to a conspiracy cause of action (Am. Compl. ¶¶ 270–78) that was dismissed in the Court's previous Memorandum Opinion and Order (Doc. 138 at 21–22). The Court will refer to the breach of implied contract claim as Count VIII.

[2] Defendants filed a Motion for Summary Judgment related to defamation and slander per se. (Doc. 194.) Given that the Court no longer exercises supplemental jurisdiction over the state law claims, the Court will deny this Motion as moot.

with prejudice. The Court declines to exercise supplemental jurisdiction over the state law claims and thus **DENIES AS MOOT** the remainder of Defendants' motion (Counts VIII, IX, and XI).

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 196) is **GRANTED IN PART** as it relates to the federal claims (Counts XV, XVII, and XIX), and these claims are **DISMISSED with prejudice**. The Court declines to exercise supplemental jurisdiction over the state law claims and thus **DENIES AS MOOT** the remainder of Defendants' motion (Counts X, XVI, XVIII, and XX).

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over the state law claims and thus **DENIES AS MOOT** Defendants' Motion for Summary Judgment (Doc. 194) Counts XIII and XIV.

**IT IS FURTHER ORDERED** that Defendants' Motion to Move the Trial (Doc. 208) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Order of Dismissal (Doc. 210) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**